# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
### WESTERN DIVISION

**GORDON SCOTT WHITFIELD**                                                    **Plaintiff**


**vs.**                                                    **Civil Action No. 3:05cv63**


**GREG HARRIS, In his individual and official
capacities as Chief of Police of the City of Grenada,
CARVER CONLEY, in his individual capacity,
JAMES FOX, in his individual capacity,
and CITY OF GRENADA, MISSISSIPPI**                              **Defendants**


<u>ORDER</u>

This cause comes before the court on the motion of defendants for summary judgment,

pursuant to Fed. R. Civ. P. 56.  Plaintiff Gordon Scott Whitfield has responded in opposition to

the motion, and the court, having considered the memoranda and submissions of the parties,

concludes that the motion is well taken and should be granted.

This is a 42 U.S.C. § 1983 case involving two separate instances in which, plaintiff

alleges, he was retaliated against for having exercised his First Amendment rights.  The first of

these instances involved a one-day suspension served by plaintiff in retaliation, he contends, for

having joined other Grenada police officers in signing a petition critical of their boss, Grenada

Police Chief Greg Harris.  At the summary judgment stage, this court is required to interpret the

facts in the light most favorable to plaintiff, as the non-moving party.  The court will therefore

quote directly from plaintiff's version of the events in this case, as set forth in his brief opposing

summary judgment.

In his brief, plaintiff describes an environment of harassment and intimidation which, he

contends, existed in the Grenada Police Department during the tenure of Police Chief Harris

(which tenure has since ended due to Harris' resignation):

> The Plaintiff, Gordon Whitfield, was employed as a police officer by the City of Grenada on October 13, 2003 and was fired in July of 2005. The Department had a serious morale problem. Many of the officers felt that they were being mistreated and there was mismanagement in the Department. All of the officers in the Department felt that Chief Greg Harris kept them from doing their jobs and harassed employees, making it hard to do their jobs. If an officer is doing his or her job, they will get complaints. Officers were always considered to be in the wrong, however. They were afraid to do their jobs.
> As noted above, a petition was signed. Whitfield was one of those who signed the petition. It was passed around to officers at work. Chief Harris claims to have not been aware of the petition, but then admitted that he had "heard talk" of it. Captain Conley had also heard of the petition, though he claimed to have not seen it. Harris was trying to find out who had signed the petition. According to Captain Rosie Washington, Harris had never seen the petition list of names. The assistant chief, Major James Earl Fox, never even heard rumors about who might have signed the petition. Harris' secretary, however, told Whitfield that she had heard that the petition was going around and she directly asked him if he had signed it. Whitfield stated that he had. It is hard to believe that the Chief's own secretary would not have told him that Whitfield had admitted signing the petition. Whitfield is certain that Harris learned that he had signed the petition because, immediately after Whitfield told Harris' secretary, the Chief began giving him the "cold shoulder." Because of that, Whitfield knew that the Chief was aware that he had signed the petition. As the Chief had not seen the petition, Whitfield was apparently the only person who the Chief was aware of that had signed the petition. An opportunity for retaliation soon arose.

Plaintiff alleges that the pretext for retaliating against him arose from his preparation of a

statement of facts attached to an affidavit in support of an arrest warrant of a suspect named

Winters. While plaintiff suspected Winters of dealing drugs, he explains that he felt that he only had

the necessary proof to charge him with misdemeanor charges of disturbing the peace, based upon

his having fled the scene of suspected drug dealing when approached by officers. In his brief,

plaintiff describes the affidavit incident as follows:

> What got Whitfield in trouble was his "Statement of Underlying Facts." The Statement of Underlying Facts is supposed to support the affidavit. It is done to justify a warrant. The Statement of Underlying Facts should lay out all of the facts of the situation that led to the charge being sought. Whitfield did just that. In his

underlying facts he just told "what happened, what he did, what I told him to do and
– this is not charging him with a felony."

> The Statement of Underlying Facts states, in its entirety:
> "On 13 Feb. 05 Jasper Winters was selling dope from his residence
> on Colfax Alley. Winters had stepped outside on the porch while
> making a drug deal. As officers turned the corner Winters took off
> running. Officers gave chase telling Winters to stop. Winters
> continued running failing to comply."

A warrant was never issued. Whitfield had to go on another call and his shift ended
before he had a chance to get the judge to sign it. The next day, while Whitfield was
off duty, Winters apparently went to the Chief to see if there was a warrant for his
arrest. The Chief learned that there was not, but that Whitfield had paperwork on
the incident and retrieved it from Whitfield's personal bag in the patrol car. The
Chief held the paperwork and that is the last Whitfield heard of it.

> The next day, at the beginning of Whitfield's shift, Harris intentionally
humiliated him in front of his fellow officers.

> Q. "Well, what -- describe the vendetta that the chief launched against
> you?
> A. He came into the briefing room the very next day and intentionally
> started degrading and humiliating me in front of the other officers.
> He told me to push my chair back from the table. I did. He said,
> 'No, push it on back.' And he made me push my chair on – I ended
> up sitting out in the middle of the floor by myself. And he says, 'This
> is directed toward Officer Gordon Whitfield and Officer Gordon
> Whitfield only.' And he says, 'You are no longer allowed to sign
> affidavits out through municipal court without it first being reviewed
> by me.' And he said, 'Do you understand?' And I said, 'This only
> applies to me?' And he said, 'Yes, sir, it does.' And he walked out.
> And all the other officers were sitting there saying that they can't
> believe that he just did that. That was real unprofessional."

Whitfield felt "degraded," especially by having this done in front of other officers.
Whitfield was singled out from all other officers of the Department in this manner.
This treatment interfered with him doing his job. Sometimes an officer is required
to see a judge on the spur of the moment. He had limitations put on him that were
not put on any other officer. Whitfield "laid low" and he would not go "over and
beyond, like I normally would."

> Whitfield filed a grievance over the embarrassment of this meeting and then
approximately two weeks later was suspended. In the "Notification of Suspension,"
Harris claims that he had documents reviewed "by two criminal justice attorneys and
law enforcement officers." Harris stated that "all concluded that the document does
not support a criminal charge. The felony allegation is without support under oath.
Your application for a warrant with a misdemeanor charge is of no comparison with
the felony allegation. It is apparent to me that you were attempting to manipulate
the procedure of obtaining a warrant."

Chief Harris apparently took issue with the fact that the statement of facts supporting the affidavit

set forth facts which accused Winters of "selling dope" and engaging in other serious misconduct, even though the affidavit sought only the issuance of a misdemeanor charge of breaching the peace by failing to stop when ordered to do so by officers. Feeling aggrieved, plaintiff was granted a hearing before the Grenada City Council, which reduced his suspension from three days to one day and which restricted his ability to sign for affidavits for three months.

Plaintiff describes his reaction to the suspension and reprimand as follows:

> The reprimand affected Whitfield's morale and performance. He did not make as many arrests or write as many tickets as he had before. Based upon comments by people in the community, Whitfield knew that word had gotten around. Grenada is a small town and "[w]ord was flying around everywhere." People were looking at him like he had done something wrong, including coworkers and the general public. Somehow the Grenada newspaper got a hold of Harris' Notification of Suspension to Whitfield and printed the whole thing. Whitfield had a copy and the city obviously had a copy. Whitfield did not give his to anyone. It is certainly not in Whitfield's interest to advertise the fact that he has been accused by his employer of committing perjury. It had to have been the City which released it. After all of this, Whitfield filed his original lawsuit.

Plaintiff argues that the aforementioned facts serve to create fact issues regarding a First Amendment retaliation claim, but the court does not agree.

There are four elements to a First Amendment retaliation claim. First, a plaintiff must have suffered an adverse employment decision. Second, the plaintiff's speech must involve a matter of public concern. Third, the plaintiff's interest in commenting on the matter of public concern must outweigh the Defendants' interest in promoting efficiency. Fourth, the protected speech must have been a substantial or motivating factor in the adverse employment action by the Defendants. See e.g. *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997); *Thompson v. City of Starkville*, 901 F.2d 456, 460 (5th Cir. 1990); *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220-21 (5th Cir. 1999).

The court concludes that, even assuming that the petition signed by plaintiff involved a matter of public concern, plaintiff has produced insufficient proof to establish fact issues as to

whether he was retaliated against on the basis of having signed that petition.  In so concluding,

the court would emphasize that plaintiff has presented no proof that Chief Harris was even aware

that he had signed the petition against him.  Indeed, Chief Harris testified in his deposition that

he was unaware that plaintiff had signed the petition.  The court would also note that the petition

against Harris was initiated by Captain Rosie Washington, who testified that Harris did not see

the petition prior to its being submitted to the City Council.  Plaintiff suggests that Harris is being

untruthful regarding his knowledge of the petition, and plaintiff contends that he informed Chief

Harris' secretary that he had signed the petition.  Plaintiff argues that a trier of fact can

reasonably infer that the secretary passed on this information to Harris.  He presents no actual

proof that this occurred, however.

The court is aware that, as previously stated, it must consider the facts in the light most

favorable to the non-moving party at the summary judgment stage.  The court would also agree

that, in an appropriate case involving sufficient circumstantial proof, a reasonable trier of fact

might reasonably disbelieve Chief Harris' testimony that he was unaware of the petition having

been signed by plaintiff.  In order to overcome a lack of direct proof of Chief Harris' knowledge,

however, it is incumbent upon plaintiff to present some other circumstantial proof which might

suggest that Chief Harris was aware that plaintiff had signed the petition and that he retaliated

against plaintiff on this basis.  In addition to speculating (without proof) that his secretary passed

on the information, plaintiff argues that Chief Harris' knowledge can be inferred from the fact

that the suspension which he received for having improperly prepared the warrant was

"ridiculous on its face."

Plaintiff's argument in this regard is made considerably more difficult by the fact that, as

he himself concedes, the City Council upheld his suspension (albeit reduced to one day),

following a hearing. Plaintiff writes in his brief as follows:

> Whitfield filed a grievance over this and did get a hearing with the city council. However, Whitfield did not receive a fair resolution, because the Chief's decision was upheld, although the suspension was reduced to one day. The city council also dictated that Whitfield had to seek supervisor approval for any warrants for three months.

The city council thus determined that plaintiff's conduct warranted a suspension and that he

should seek supervisor approval for future warrants. The latter finding is, of course, almost

identical to the reprimand originally meted out by Chief Harris against plaintiff in front of fellow

officers. Given that a body untainted by any suggestion of retaliatory intent agreed with Chief

Harris that plaintiff's conduct merited suspension, plaintiff's argument that retaliation was a

substantial motivating factor for that suspension loses much of its force.

The court would also note that a review of the statement of facts prepared by plaintiff

does appear to reveal notable deficiencies in that document. Specifically, the statement of facts

supporting the affidavit accuses Winters, in a conclusory manner, of "selling dope" and it alleges

that he ran away when approached by officers. Clearly, the facts alleged do not appear to

correspond to misdemeanor charges of breaching the peace as much as felony charges of drug

dealing. While it may (or may not) be the case that Chief Harris overreacted in his disciplining

of plaintiff, the court does not agree that it was "ridiculous on its face" for Chief Harris and then

the City Council to have taken issue with the statement of facts prepared by plaintiff. Clearly,

preparing an affidavit supporting an arrest warrant is a serious matter, and serious consequences

can result if an affidavit is prepared in an improper manner.

The plaintiff's lack of proof that retaliation motivated Chief Harris' actions in this case

becomes even more apparent when one considers plaintiff's description of Harris' customary

leadership style, even absent retaliatory intent. This court would quote once again from

plaintiff's description of the culture which existed in Chief Harris' police department prior to the

petition against him being signed:

> The Department had a serious morale problem. Many of the officers felt that they
> were being mistreated and there was mismanagement in the Department. All of the
> officers in the Department felt that Chief Greg Harris kept them from doing their
> jobs and harassed employees, making it hard to do their jobs. If an officer is doing
> his or her job, they will get complaints. Officers were always considered to be in the
> wrong, however. They were afraid to do their jobs.

Even if this court is to accept that Chief Harris had an unusually harsh reaction to the defective

affidavit prepared by plaintiff, it is, to reiterate, incumbent upon plaintiff to present proof that

this reaction constituted retaliation for plaintiff's having exercised his First Amendment rights.

Plaintiff's efforts to prove retaliation by circumstantial evidence become even more

difficult when plaintiff himself argues that "officers were always considered to be in the wrong"

in Chief Harris' police department and that he was often "mistreating" and "harassing" them.

Based upon plaintiff's own description of his leadership style, Chief Harris reacted in exactly in

accordance with his typical behavior in sanctioning plaintiff in this case. Under these

circumstances, the court concludes that, even considering the facts in the light most favorable to

plaintiff, Whitfield has presented insufficient circumstantial proof which might lead a reasonable

trier of fact to conclude that the suspension which he received resulted even in part from his

having signed the petition against Chief Harris. The court therefore concludes that plaintiff has

insufficient proof to establish fact issues as to whether defendants violated federal law and/or the

U.S. Constitution in suspending him in this case.[1]

Likewise without merit are plaintiff's state law claims for slander and "interference with employment," based upon Chief Harris' having criticized him in front of fellow officers for the defective affidavit incident. It should be readily apparent that a Police Chief is privileged to make criticisms of his officers in appropriate cases, *see e.g. Killebrew v. Jackson City Lines*, 225 Miss. 84, 82 So. 2d 648 (Miss. 1955), and the fact that the City Council upheld plaintiff's suspension suggests that there was considerable truth to Chief Harris' criticisms. At any rate, there is no evidence that Chief Harris was acting in bad faith within the meaning of Mississippi's defamation and/or interference with employment relations jurisprudence in this case, *see Morrison v. Mississippi Enterprise for Technology, Inc.*, 798 So.2d 567, 574-75 (Miss. App. 2001), and thus no proof that Harris exceeded the scope of the privilege which he enjoyed.

It would clearly be bad public policy for the courts to permit a slander and/or interference with employment relations lawsuit even in cases where a supervisor might have gone overboard in criticizing a subordinate. It may well be the case that Chief Harris was an unusually difficult man to work for, and the fact that a petition was signed against him suggests that this is likely the case. Many employees in this state are forced to work for difficult bosses, however, and this does not mean that such employees have a civil cause of action against their bosses in cases

---

[1]Plaintiff also suggests that his suspension constituted a due process violation, but he similarly lacks proof on this issue. In analyzing plaintiff's substantive due process claim, the court must determine "whether a plaintiff's substantive due process right was violated by abusive, irrational or malicious abuse of government power that shocks the conscience." *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999). Plaintiff was, to reiterate, provided with a hearing before the City Council, which affirmed his reduced suspension. Nothing in the record before the court suggests a "malicious abuse of government power that shocks the conscience." Plaintiff presents no proof establishing fact issues as to whether his substantive or procedural due process rights were violated in this case, and it is thus apparent that his federal claims lack merit.

where they feel they are treated in an overly harsh manner. Plaintiff complains of the local

newspaper printing news of his suspension, but he has no proof regarding who leaked this

information to the newspaper and, at any rate, the report of the suspension was accurate and thus

not defamatory. In light of the foregoing, the court concludes that all of plaintiff's state and

federal claims arising out of the original affidavit incident are without merit and due to be

dismissed.

The court now turns to a separate incident which occurred after plaintiff filed the original

lawsuit in this case, and which led to his termination. This incident arose out of plaintiff's

response to a domestic violence complaint, during which plaintiff forcibly restrained a suspect

named Bledsoe. Bledsoe and plaintiff scuffled during the arrest, and Bledsoe was charged with a

misdemeanor charge of resisting arrest and a felony charge of assaulting a police officer.

Bledsoe, in turned, filed his own complaint against plaintiff, alleging that he had used excessive

force in arresting him.

Plaintiff's eventual termination in this case arose out of his actions in communicating

with the local prosecutor's office and with Bledsoe himself regarding a dismissal of the more

serious "assaulting an officer" charge in exchange for Bledsoe's pleading guilty to the

misdemeanor charge of resisting arrest. In his brief, plaintiff describes Chief Harris' actions in

recommending his termination:

> Harris' memo to Gordon Whitfield regarding "Termination of Employment"
> lists no less than seven different regulations which Whitfield supposedly violated.
> Harris relied upon the Code of Conduct Manual, Sections 4.31C and 4.31G, which
> were referred to independently by Fox and Conley. He also went on, however, to
> list 4.31K (Conduct Subversive to the Good Order and Discipline of the
> Department), 9.6B (Interfering with the Attendance and Testimony of a Witness,
> Coercion, Bribery or other means), and 9.6D (Related to Dismissal or Reduction of a
> Charge Without Approval of the Chief of Police). Harris also charged Whitfield

under the City of Grenada Rules and Regulations with insubordination and violation of, or refusal to comply with, an established law or regulation when such conduct impairs the effectiveness of the City or brings it into public disrepute.

Harris almost literally "threw the book" at Whitfield and went far beyond his subordinates recommendations. Harris clearly went to a lot of trouble to try and make sure that the charges stuck. Whitfield was terminated on July 15, 2005. Whitfield filed a grievance and the city council was informed of all the charges. He had a hearing before the city council. Interestingly, after the hearing was over, the city attorney offered to not put anything negative in his file if Whitfield would quit. Whitfield refused and the city ended up upholding Chief Harris' decision.

The court deems it unnecessary to discuss all of the events surrounding plaintiff's termination, but it would note that plaintiff himself admits to having engaged in conduct which, in the court's view, supports Chief Harris' and the City Council's decision to terminate him. Specifically, the court would note plaintiff's own description of a conversation in which he appeared to engage in a bartering process with Bledsoe involving the charges pending against him, for plaintiff's own personal benefit. In his brief, plaintiff describes his deposition testimony as follows:

> Whitfield decided to go see Bledsoe. When he did, the investigation into the excessive force complaint was already over.
> "A. I thought about it. I left there that day. I thought about it. And the next morning, I was working a double shift, and I was working over in that area where Mr. Bledsoe lives. I stopped, asked him if I could talk to him a minute. He said yeah. He came outside. I told him that I had thought about it, and I said, if he wanted to plead to the misdemeanor charges that I didn't have a problem not pursuing the felony charge on him. I said, 'You know, it's –' he said, 'Well, I appreciate it.' He said, 'I don't want to have to go to jail over –' and I was, like, 'Well, I don't want to -- over one mistake that a man makes, I don't want to see you go to jail over something stupid.' And he shook my hand, and he thanked me. He -- I then told him that -- I said -- I said, 'Well, look, Johnny,' I said, 'you know, you also made a complaint on me the other day.' He said, 'Yeah, I know.' I said, 'Well, my bosses up there take a look at our complaints -- anytime we get a complaint, they look at us like we've done something wrong even when we hadn't." And he said, 'Yeah, yeah, I know.' I said, 'Well, look, I'd appreciate a statement from you saying that we didn't do anything wrong. You made the complaint.' And he was like, 'Well, what does it need to say.' And I said, 'I just want you to tell the truth.'"

Plaintiff's own testimony thus supports a conclusion that he was seeking to interject himself in the plea bargaining process for his own personal benefit, namely the dropping of the excessive force complaint which Bledsoe had file against him. As noted previously, Chief Harris based his termination of plaintiff in part on violation of a department policy against "Interfering with the Attendance and Testimony of a Witness, Coercion, Bribery or other means," and this finding clearly appears to relate to the conversation quoted above.

Plaintiff argues that police officers very often communicate with the procecutor's office regarding reduction of criminal charges and other plea bargaining matters. That may well be the case. Plaintiff presents no proof, however, that it is an accepted practice in the Grenada Police Department for officers to interject themselves in the plea bargaining process for their own personal benefit. Plaintiff's own description of his visit to Bledsoe's house supports a conclusion that he became involved in the plea bargaining process at least in part so that he could secure a dismissal of the complaint against him. Plaintiff submits that the investigation into the excessive force charge against him had been completed by the time he talked with Bledsoe, but it is obvious from plaintiff's own testimony that he deemed a dismissal of the complaint to be something of personal value to him. Under these circumstances, it was clearly improper for plaintiff to approach Bledsoe and represent himself as having the authority to reduce the charges against Bledsoe in exchange for a dismissal of the complaint against himself.

While plaintiff did not expressly tie this reduction of charges against Bledsoe to the dismissal of Bledsoe's complaint against him, the implication is clear from plaintiff's own description of the conversation in question. Moreover, plaintiff's statement to Bledsoe that "if he wanted to plead to the misdemeanor charges that I didn't have a problem not pursuing the felony charge on him" clearly appears to misrepresent plaintiff as being the relevant prosecutorial authority in plea

bargaining matters. Plaintiff argues that his termination was motivated by the petition and

subsequent lawsuit which he filed in this case, but it is apparent from his own testimony that

plaintiff engaged in misconduct of a serious nature. Moreover, the City Council upheld all of the

sanctions issued against plaintiff in this case following a due process hearing, and plaintiff's

argument that his punishment represented personal retaliation on the part of Chief Harris and/or a

due process violation is without merit. In the court's view, there exists no genuine issue of fact

regarding whether any of the disciplinary measures against plaintiff in this case constituted a

violation of federal or state law, and the motion for summary judgment is due to be granted.[2]

It is therefore ordered that defendants' motion for summary judgment is granted.

A separate order will be issued this date in accordance with Fed. R. Civ. P. 58.

SO ORDERED, this the 22nd day of February, 2007.


                                    **/s/ Michael P. Mills**
                                    **UNITED STATES DISTRICT JUDGE**

---

[2]This finding necessarily dictates a dismissal of the complaint against co-defendants
Conley and Fox as well.